**Affirm in part, reverse in part and remand; Opinion Filed August 22, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-18-00261-CV

**RICHARD GOLDBERG, KENNETH GOLDBERG, GEOMET RECYCLING, LLC JOSH APPLEBAUM, ALICIA MCKINNEY, ELOISA MEDINA, LEE WAKSER, SPENCER LIEMAN, MIKEL SHECHT, LAURA MYERS, HENRY JACKSON, AND KELLY COUCH, Appellants**

**V.**

**EMR (USA HOLDINGS) INC., EMR GOLD RECYCLING, LLC, GOLD METAL RECYCLERS MANAGEMENT, LLC, GOLD METAL RECYCLERS, LTD., GMY ENTERPRISES, LLC, GMY, LTD., GOLD METAL RECYCLERS—GAINESVILLE, DLLC, GOLD METAL RECYCLERS—FORT WORTH, LLC, GOLD METAL RECYCLERS—OKLAHOMA, LLC, AND GOLDBERG INDUSTRIES, INC., Appellees**

**On Appeal from the 116th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-17-14064**

# OPINION

Before Justices Myers, Brown, and Whitehill
Opinion by Justice Myers

This case concerns the applicability of the Texas Citizens Participation Act (TCPA) to breach of contract and various commercial torts, including misappropriation of trade secrets and breach of fiduciary duty. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 27.001–.011. Appellees (Plaintiffs) sued appellants (Defendants). Defendants moved for dismissal of the claims, asserting the "legal action" was based on, related to, or in response to their communications that were protected under the TCPA. The trial court denied Defendants' motion to dismiss. Defendants bring five issues in this interlocutory appeal contending the trial court erred by

denying their motion to dismiss because: (1) Plaintiffs' claims are based on, relate to, or are in response to Defendants' exercise of their right of association or free speech; (2) Plaintiffs did not establish that the commercial-speech exemption applied to their claims; (3) Plaintiffs did not offer prima facie proof of the elements of each claim to each defendant; (4) the trial court abused its discretion by failing to exclude certain evidence Plaintiffs offered; and (5) Plaintiffs failed to establish that the TCPA violates the constitutional rights to jury trial, open courts, and due process.[1]  *See id.* § 51.014(a)(12) (authorizing interlocutory appeal from denial of motion to dismiss under TCPA).  We affirm the trial court's judgment in part and reverse in part.

## BACKGROUND

From 1976 to 2011, Kenneth Goldberg (Goldberg) co-owned and operated a scrap-metal recycling company called Gold Metal Recyclers.  In 2011, Goldberg sold Gold Metal to EMR Holdings for over $100 million.  After the sale, Goldberg stayed on as manager of Gold Metal, now part of EMR, and he agreed not to compete with EMR and its entities (Plaintiffs) for three years after leaving employment with the company.  Goldberg signed confidentiality agreements promising not to use Plaintiffs' confidential information for the benefit of "any person" other than Plaintiffs.

Goldberg left Gold Metal, and after waiting three years, he opened a scrap-metal recycling business, Geomet Recycling.  To staff Geomet, he hired some of Plaintiffs' employees.

Five months after Geomet went into business, Plaintiffs sued Goldberg, Geomet, and Plaintiffs' former employees who had gone to work for Geomet for violations of the Texas Uniform Trade Secrets Act (TUTSA), breach of contract, breach of fiduciary duty, tortious

---

[1] Appellees filed a conditional cross-appeal challenging two orders denying discovery.  We dismissed the cross-appeal for want of jurisdiction.

interference with contract, and conspiracy. Plaintiffs sought monetary damages and injunctive relief.

Defendants moved for dismissal of the suit under the TCPA, asserting Plaintiffs' lawsuit was based on, related to, or was in response to Defendants' exercise of the right of association or free speech. Plaintiffs filed a response to the motion to dismiss, attaching numerous affidavits and exhibits purporting to show their claims were not based on Defendants' exercise of their rights and that the suit was exempt from the TCPA. Plaintiffs also asserted the evidence set forth a prima facie case for each element of their causes of action.

The trial court denied Defendants' motion to dismiss without stating a reason for the denial of the motion and without making findings of fact and conclusions of law. The trial court overruled all objections to the evidence submitted in the proceeding. The trial court also entered a temporary restraining order prohibiting Defendants Goldberg, Josh Applebaum, Laura Myers, "and all entities or individuals acting with them or at their direction . . . from directly or indirectly using, disclosing, replicating, or otherwise misappropriating for their own individual or collective use or benefit . . . any of Plaintiffs' Trade Secrets or Confidential Information."

## TEXAS CITIZENS PARTICIPATION ACT

The TCPA permits a defendant to move for dismissal of a legal action that is "based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association." CIV. PRAC. § 27.003(a). The statute's purpose "is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." *Id.* § 27.002.

Determination of a motion to dismiss under the TCPA is a three-step process. *Youngkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018).[2] In step 1, the movant for dismissal has the burden of showing by a preponderance of the evidence that the legal action is based on, relates to, or is in response to the movant's exercise of one of those rights. CIV. PRAC. § 27.005(b). If the movant does so, then the procedure moves to step 2, and the burden of proof shifts to the nonmovant bringing the legal action to "establish[] by clear and specific evidence a prima facie case for each essential element of the claim in question." *Id.* § 27.005(c). If the nonmovant meets this burden, then the procedure moves to step 3, and the burden of proof shifts back to the movant to "establish[] by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." *Id.* § 27.005(d). Dismissal of a legal action under the TCPA is with prejudice to the refiling of the legal action. *See LegacyTexas Bank v. Harlan*, No. 05-18-00039-CV, 2018 WL 2926397, at \*5 (Tex. App.—Dallas June 7, 2018, no pet.) (mem. op.); *Breitling Oil & Gas Corp. v. Petroleum Newspapers of Alaska, LLC*, No. 05-14-00299-CV, 2015 WL 1519667, at \*3 (Tex. App.—Dallas Apr. 1, 2015, pet. denied) (mem. op.).

The evidence considered by the trial court in determining a motion to dismiss includes "the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." CIV. PRAC. § 27.006(a). However, the plaintiff's pleadings are usually "the best and all-sufficient evidence of the nature of the action." *Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017) (quoting *Stockyards Nat'l Bank v. Maples*, 95 S.W.2d 1300, 1302 (Tex. 1936)).

When a party appeals the denial of its motion to dismiss under the TCPA, the appeal stays the commencement of the trial and "all other proceedings in the trial court pending resolution of that appeal." CIV. PRAC. § 51.014(b).

---

[2] In *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017) (per curiam), the supreme court described it as a "two-step procedure." The actual parts of the procedure are the same under both *ExxonMobil* and *Youngkin*, relying on section 27.005(b), (c), and (d).

**CONSTITUTIONALITY OF THE TCPA**

Before applying the TCPA to this case, we first consider Defendants' fifth issue, which contends the trial court erred to the extent it may have determined the TCPA is unconstitutional. In their response to Defendants' motion to dismiss, Plaintiffs asserted the TCPA violated their right to a jury trial under the Texas Constitution, violated the Texas Constitution's Open Courts Provision, and violated the Due Process and Due Course of Law Clauses of the United States and Texas Constitutions.

**Right to Jury Trial**

Plaintiffs asserted the TCPA's first and third steps, which require the trial court instead of a jury to apply the preponderance-of-the-evidence burden of proof, violate Plaintiffs' right to a jury trial. In this case, we conclude there is no violation of the right to a jury trial.

The right to a jury trial of civil actions is guaranteed by the Texas Constitution. *See* TEX. CONST. art. I, § 15; *id.* art. V, § 10. Article 1, section 15 grants the right to a jury trial for those actions, or analogous actions, where a jury was available when the Texas Constitution was adopted in 1876. *Barshop v. Medina Cty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 636 (Tex. 1996); *Roper v. Jolliffe*, 493 S.W.3d 624, 631 (Tex. App.—Dallas 2015, pet. denied). Article 5, section 10 provides the right to have a jury resolve fact questions in "all 'causes' in a Texas district court." *Barshop*, 925 S.W.2d at 636; *Roper*, 493 S.W.3d at 634.

Step 1 of the TCPA procedure, determination of whether the "legal action is based on, relates to, or is in response to the party's exercise of the right of free speech, the right to petition, or the right of association," is not a "cause" nor does the determination of that step resolve any substantive element of a cause or defense. Instead, it simply results in the procedural determination of whether the TCPA analysis proceeds to step 2. The right to jury trial does not attach to this step of the TCPA procedure.

Step 2 of the TCPA analysis concerns whether the plaintiff "establishe[d] by clear and specific evidence a prima facie case for each essential element of the claim in question." Civ. Prac. § 27.005(c). If the plaintiff does not make this showing, then the trial court must dismiss the suit. *Id.* § 27.005(b), (c). As the supreme court explained in *In re Lipsky*, 460 S.W.3d 579 (Tex. 2015) (orig. proceeding), this standard requires the plaintiff to present "enough detail to show the factual basis for its claim" and "the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id.* at 590–91. Thus, step 2 of the motion to dismiss under the TCPA has the same effect as a no-evidence motion for summary judgment under Rule of Civil Procedure 166a(i). Rule 166a(i) does not violate a party's right to trial by jury. *See Springer v. Am. Zurich Ins. Co.*, 115 S.W.3d 582, 585 (Tex. App.—Waco 2003, pet. denied); *Lattrell v. Chrysler Corp.*, 79 S.W.3d 141, 150 (Tex. App.—Texarkana 2002, pet. denied). "When a party cannot show a material fact issue, there is nothing to submit to a jury, and the grant of summary judgment to the opposing party does not violate the constitutional right to a jury trial." *Lattrell*, 79 S.W.3d at 150. Therefore, the requirement that the plaintiff meet essentially the same standard under section 27.005(c) does not violate the right to jury trial.

Concerning the third step, that the trial court must dismiss the legal action if the movant "establishes by a preponderance of the evidence each essential element of a valid defense," we need not determine whether this provision violates the constitutional right to a jury trial because Defendants did not attempt to prove any defenses in their motion to dismiss.

Plaintiffs did not establish that the TCPA violates their right to a jury trial in this case.

## Open Courts and Due Process

The Open Courts provision of the Texas Constitution, article 1, section 13, states, "All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." Tex. Const. art. I, § 13. This is a due-

–6–

process guarantee that a person bringing a well-established common-law cause of action will not be denied access to the courts arbitrarily or unreasonably. *Yancy v. United Surgical Partners Int'l, Inc.*, 236 S.W.3d 778, 783 (Tex. 2007). Under this provision, "the legislature may not abrogate the right to assert a well-established common law cause of action unless the reason for its action outweighs the litigants' constitutional right of redress." *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 520 (Tex. 1995) (quoting *Trinity River Auth. v. URS Consultants, Inc.*, 889 S.W.2d 259, 261 (Tex. 1994)). The Due Process Clause of the United States Constitution and the Due Course Clause of the Texas Constitution prohibit the government from depriving a person of life, liberty, or property without due process of law. *See* U.S. CONST. amend. XIV; TEX. CONST. art. I, § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.").

Plaintiffs argue the TCPA violates the Open Courts provision and the Due Process/Due Course Clauses because it does not permit cross-examination of affiants in steps 1 and 3 of the procedure when the movant's burden of proof is by a preponderance of the evidence. Plaintiffs appear to assert the TCPA prohibits depositions, which would make cross-examination impossible. This Court has concluded that the limited discovery permitted under section 27.006(b) includes depositions. *In re Spex Grp. US LLC*, No. 05-18-00208-CV, 2018 WL 1312407, at *4 (Tex. App.—Dallas Mar. 14, 2018, orig. proceeding) (mem. op.); *see also Lane v. Phares*, 544 S.W.3d 881, 889 n.1 (Tex. App.—Fort Worth 2018, no pet.) (under section 27.006, court of appeals reviewing motion to dismiss considered deposition trial court allowed). We conclude the TCPA does not prohibit cross-examination as relevant to determination of the motion to dismiss.

Plaintiffs also argue the TCPA violates their right to open courts because it prevents a party from obtaining discovery except under limited circumstances. Section 27.003(c) states that after a motion to dismiss is filed, "all discovery in the legal action is suspended until the court has ruled on the motion to dismiss." CIV. PRAC. § 27.003(c). That section has an exception permitting discovery "as provided by Section 27.006(b)," and section 27.006(b) permits the trial court to "allow specified and limited discovery relevant to the motion [to dismiss]." *Id.* § 27.006(b). Several courts have concluded this statute does not violate the Open Courts provision. *See Landry's, Inc. v. Animal Legal Defense Fund*, 566 S.W.3d 41, 68 (Tex. App.—Houston [14th Dist.] 2018, pet. filed); *Mem'l Hermann Health Sys. v. Khalil*, No. 01-16-00515-CV, 2017 WL 3389645, at *16 (Tex. App.—Houston [1st Dist.] Aug. 8, 2017, pet. denied) (mem. op.); *Abraham v. Greer*, 509 S.W.3d 609, 615–16 (Tex. App.—Amarillo 2016, pet. denied); *Combined Law Enforcement Ass'n of Tex. v. Sheffield*, No. 03-13-00105-CV, 2014 WL 411672, at *10 (Tex. App.—Austin Jan. 31, 2014, pet. denied) (mem. op.). We agree with these courts and conclude that the restrictions on discovery do not violate the Open Courts provision.

Plaintiffs also argue the TCPA violates the Open Courts provision because it requires the trial court to award a prevailing movant its costs, attorney's fees, and other expenses; and the statute also requires the trial court to award sanctions against the party bringing the legal action, "sufficient to deter the party who brought the legal action from bringing similar actions described in this chapter." CIV. PRAC. § 27.009(a). The supreme court has interpreted this provision as requiring the trial court to award reasonable attorney's fees to a prevailing movant. *Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016); *see also Cruz v. Van Sickle*, 452 S.W.3d 503, 522 (Tex. App.—Dallas 2014, pet. denied). A statute that awards a prevailing party reasonable attorney's fees or sanctions does not violate the Open Courts provision. Such a statute does not

bar access to the courts "because sanctions are imposed and litigation costs are shifted only after the claims are resolved." *Landry's*, 566 S.W.3d at 69.

Plaintiffs also argued in the trial court that the TCPA violates the Open Courts provision because it

> interferes with a party's right to seek injunctive relief *pendente lite*—as in this case—where immediate relief is proper to ensure that the party has a meaningful opportunity to obtain judicial (especially equitable) relief. . . . [T]he TCPA's process—including the stay provision applicable to interlocutory appeals—unduly restricts a party's access to the Courts and impairs the assertion of legal claims.

*See* CIV. PRAC. § 51.014(b) (interlocutory appeal from denial of dismissal under TCPA "stays the commencement of a trial" and "stays all other proceedings in the trial court pending resolution of that appeal"). While this appeal was pending, Plaintiffs filed a motion to lift the stay under section 51.014(b) to permit them to pursue contempt proceedings in the trial court against Defendants for violating a temporary restraining order, and to pursue a temporary injunction. We granted the motion and lifted the stay to permit the trial court to hold a hearing on Plaintiffs' motion for temporary injunction and motion for contempt. The supreme court concluded this order was an abuse of discretion. *In re Geomet Recycling LLC*, No. 18-0443, 2019 WL 2482125, at *1, *6 (Tex. June 14, 2019) (orig. proceeding). The supreme court said the stay of trial court proceedings under section 51.014(b) did not leave Plaintiffs without a remedy during the appeal because Plaintiffs could have sought injunctive relief from this Court under Rule of Appellate Procedure 29.3. *Id.* at *4–5; *see also* TEX. R. APP. P. 29.3. In light of the supreme court's opinion in *In re Geomet*, we conclude Plaintiffs have not shown the TCPA "unduly restricts a party's access to the courts" or that it "impairs the assertion of legal claims."

We conclude Plaintiffs have not shown the TCPA violates the Texas or United States Constitutions. The trial court erred to the extent, if any, that the denial of Defendants' motion to

dismiss was based on Plaintiffs' assertion that the TCPA is unconstitutional. We sustain Defendants' fifth issue.

## PLAINTIFFS' CLAIMS

When Goldberg sold Gold Metal to EMR, the sale agreement contained a nondisclosure provision stating each "Seller," which included Goldberg, agreed "that all customer, prospect, and marketing lists, sales data, intellectual property, employee information, proprietary information, trade secrets and other confidential information" of Gold Metal before the sale would "be owned exclusively by EMR" after the closing of the sale. The provision also stated that each "Seller," including Goldberg, promised to treat the information as confidential and promised "not to make use of such information for its own purposes or for the benefit of any other Person."

After the sale, Goldberg went to work for one of the Plaintiffs as its chief executive officer. His employment agreement contained a nondisclosure provision stating he agreed that he would not, even after termination of his employment, "disclose to or use for the benefit of any person, corporation or other entity, or for himself, any and all files, trade secrets or other confidential information concerning the internal affairs of [Plaintiffs], including, but not limited to, information pertaining to its clients, services, products, earnings, finances, operations, methods or other activities." This nondisclosure provision did not apply to information that was "of public record or is generally known, disclosed or available to the general public or the industry generally." The employment agreement also included noncompetition provisions in which Goldberg promised not to own or work for a competing company for one year after his employment with Plaintiffs ceased. This noncompetition provision also prohibited Goldberg from hiring any of Plaintiffs' employees for one year after he left Plaintiffs. Goldberg was also

on EMR's board of directors and promised not to compete with EMR for three years after he left the board of directors.

Plaintiffs' employees, including the other individual Defendants, received Plaintiffs' employee handbook. The handbook contained a nondisclosure provision about confidential information:

> During employment at the Company, employees may acquire confidential information belonging to the Company such as, but not limited to, customer information, accounts, prospects, trade secrets, procedures, sales data, supply sources, contracts, price lists, practices, financial data, company plans, legal matters, passwords, hard copy documents, electronic files, and other specific information concerning the Company, its suppliers, its customers, and its employees. Employees are responsible for maintaining strict confidentiality of all company information. Employees should also avoid disclosure of confidential information about the Company, its customers, and its suppliers to outside parties who are not employed and/or do not have authorization to access confidential information. Employees agree that all such information is the exclusive property of the Company and that they will not at any time divulge or disclose to anyone, except in the responsible exercise of an employee's job, any such information, whether or not the information has been designated specifically as confidential. The unauthorized release or removal of such information will be viewed as grounds for discipline, up to and including termination of employment and possible legal action against employee.

The handbook also stated that "[p]rograms and information on computers are to be treated as proprietary and confidential" and that "[e]mployees may not use computers to disclose confidential and proprietary information."

Plaintiffs' computer system, Trade 2, "contain[ed] a compilation of information of virtually all of EMR Group's commercial data, including the operational transactions that take place within EMR Group (and its related companies), as well as inventory control and virtually all aspects of the relationships with customers [suppliers] and consumers [purchasers]." Many of Plaintiffs' purported trade secrets were contained within Trade 2. When they worked for Plaintiffs, all the individual Defendants had at least some access to parts of Trade 2.

–11–

Goldberg resigned from EMR's board of directors in September 2013, and he resigned from his CEO position in September 2014. The noncompete agreements expired by September 17, 2016.

In May 2017, Goldberg formed a new company, Geomet, which would be competing directly with Plaintiffs.

From November 2016 and continuing through 2017, many of Plaintiffs' employees resigned and ultimately went to work for Geomet. Many of these employees, when they worked for Plaintiffs, communicated with scrap-metal suppliers and purchasers to buy and sell the scrap metal that constituted Plaintiffs' business. When these employees went to work for Geomet, they contacted some of those same suppliers and purchasers.

A few of the employees, before they resigned from Plaintiffs, e-mailed to their personal e-mail accounts information from Plaintiffs' computer database, including seller and purchaser lists, inventory of some of Plaintiffs' facilities, environmental reports, and information about Plaintiffs' employees. Plaintiffs considered all this information to be trade secrets. Some of the employees took cell phones, laptop computers, and computer tablets belonging to Plaintiffs with them when they resigned. Some of these items were later returned to Plaintiffs but with records of their use erased. Plaintiffs hired a company to examine these computers, phones, and tablets. The company determined that USB storage devices such as external hard drives had been attached to some of the computers and others had accessed data-storage websites.

Plaintiffs complain that Goldberg violated his employment agreement by contacting Plaintiffs' employees and persuading them to resign and work for Geomet. Plaintiffs also complain that the individual Defendants breached the nondisclosure provisions of Plaintiffs' employee handbook by downloading information and sending it to their personal e-mail accounts or by using external hard drives and data-storage devices and websites. Plaintiffs also complain

that the individual Defendants, after they went to work for Geomet, violated Plaintiffs' employee handbook by contacting scrap-metal suppliers and purchasers who were also suppliers and purchasers from Plaintiffs. Plaintiffs complain that the individual Defendants contacted some of the same people at the purchasers and suppliers with whom they did business while employed by Plaintiffs. Some of these contacts resulted in purchases and sales of scrap metal by Geomet. Plaintiffs assert that if the purchasers and suppliers had come to them instead of Geomet, Plaintiffs would have made a profit from those purchases and sales.

Plaintiffs also complain about the Pecan House incident. Pecan House & Recycling sold scrap metal to Plaintiffs. Pecan House agreed to send one of the Plaintiffs, Gold Metal Recyclers, a load of scrap metal, and Gold Metal Recyclers made an advance payment to Pecan House for the scrap metal. According to Plaintiffs, before Pecan House delivered the scrap metal, Defendant Mikel Shecht falsely represented to Pecan House that Gold Metal Recyclers had shut down and moved its operations to Geomet. After talking to Shecht, Pecan House delivered the load of scrap metal to Geomet instead of to Gold Metal Recyclers. Defendant Henry Jackson signed for the load when it arrived.

Plaintiffs' assertions of their damages include the lost value of the goodwill in the purchase from Goldberg, the lost sales due to Defendants' contacting the purchasers who did business with Plaintiffs, and the loss to Plaintiffs' inventory of scrap metal they would have purchased from the scrap-metal providers had Defendants not contacted Plaintiffs' suppliers and purchased it. Plaintiffs assert they would have made a profit on the scrap-metal Defendants purchased. Plaintiffs also seek disgorgement of Defendants' profits from doing business with the suppliers and purchasers. Plaintiffs also claim as damages the costs of recruiting and training new employees for the positions previously held by Plaintiffs' employees who went to work for

Geomet. Plaintiffs also seek injunctive relief to bar Defendants from using or otherwise misappropriating Plaintiffs' trade secrets or other confidential information.

## COMMERCIAL-SPEECH EXEMPTION

In their second issue, Defendants contend the trial court erred to the extent it may have applied the commercial-speech exemption. Section 27.010(b) provides:

> This chapter does not apply to a legal action brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services, or an insurance product, insurance services, or a commercial transaction in which the intended audience is an actual or potential buyer or customer.

CIV. PRAC. § 27.010(b). Plaintiffs had the burden of proving their legal action qualified for the exemption from the TCPA. In this case, we view the evidence in the light most favorable to Plaintiffs. *See Serafine v. Blunt*, 466 S.W.3d 352, 369 n.28 (Tex. App.—Austin 2015, no pet.) (concluding evidence should be viewed in light most favorable to claimant either because trial court ruled in favor of claimant or because claimant was nonmovant on motion to dismiss).

For a legal action to fall within the exemption, (1) the defendant must be primarily engaged in the business of selling or leasing goods; (2) the defendant must have made the statement or engaged in the conduct on which the legal action is based in the defendant's capacity as a seller or lessor of those goods or services; (3) the statement or conduct at issue must have arisen out of a commercial transaction involving the kinds of goods or services the defendant provides; and (4) the intended audience of the statement or conduct must have been "an actual or potential buyer or customer" of the defendant for the goods or services the defendant provides. *See* CIV. PRAC. § 27.010(b); *Castleman v. Internet Money Ltd.*, 546 S.W.3d 684, 690 (Tex. 2018) (per curiam).

In this case, Defendants' statements and conduct fall into four categories: (1) communications with actual or potential purchasers of Defendants' products or services from

Defendants; (2) communications with scrap-metal suppliers to Defendants (including the Pecan House incident), as well as communications with haulers and other third parties; (3) communications between the Defendants themselves, and (4) communications between Defendants and Plaintiffs' employees in attempts to hire Plaintiffs' employees. Of these, only the first category of communications, communications with actual or potential purchasers of Defendants' products and services from Defendants, qualifies for the exemption. The other categories do not involve statements or conduct in which the intended audience is an actual or potential purchaser of Defendants' products.

Defendants argue the commercial-speech exemption does not apply because they were not "primarily engaged in the business of selling or leasing goods or services." Defendants rely on Goldberg's testimony in his affidavit:

> While reselling recycled scrap metal is a key part of Geomet's business, scrap metal consumers tend to find sources such as Geomet and not as much the other way around—just as Geomet searches out suppliers of scrap metal. For this reason, the resale step of Geomet's business is not more important than the scrap metal purchase and preparation activities of Geomet, which take up most of Geomet's time and resources. Except for myself, and Defendants Richard Goldberg, Josh Applebaum, and Mikel Shecht, the individual Defendants in this Lawsuit have virtually no direct involvement in selling Geomet's goods and services to consumers, or in conducting commercial transactions where the intended audience is an actual or potential buyer. Other than Josh Applebaum, the individual Defendants in this Lawsuit spend most or all of their time and resources involved in the buying, processing, or transport of scrap metal, or administrative matters, for Geomet.

Defendants argue this evidence shows Geomet and the individual defendants other than Applebaum were not *primarily* engaged in the business of selling goods or services.

Defendants' argument appears to be that a company is not "primarily engaged in the business of selling or leasing goods or services" unless the majority of its time or resources are utilized in the selling of the goods or services as opposed to their acquisition, manufacture, or performance. We disagree. Andrew Sheppard, the chief operating officer for one of EMR's

entities, testified in his affidavit that scrap-metal dealers like Geomet "render services and sell goods for the purpose of making a profit." Without the product or service, there is no sale or lease and no profit. The fact that the product or service may sell or lease quickly with minimal marketing effort does not mean that the defendant is not "primarily engaged in the business of selling or leasing goods or services." We conclude that Geomet, which derived its revenues from its sale of recycled or repackaged scrap metal, was primarily engaged in the business of selling its products even if marketing those products used little of its time and resources.[3]

Defendants also assert that most of the individual Defendants worked in an administrative capacity or were involved in aspects of the business other than selling the products or services to consumers. They argue that those Defendants were not "primarily engaged in the business of selling or leasing goods or services." We disagree. An employee of a business that is primarily engaged in the business of selling or leasing goods or services is also primarily engaged in that business when acting within the scope of the person's employment. The individual Defendants involved in Geomet's administrative matters or in the buying, processing, or transport of scrap metal were primarily engaged in the business of selling or leasing goods or services because their labors assisted in the commercial enterprise leading to the sale or lease of the goods or services. *But see Whisenhunt v. Lippincott*¸ 474 S.W.3d 30, 42 (Tex. App.—Texarkana 2015, no pet.) (commercial-speech exemption did not apply because defendants were administrators not involved in sale of goods or services). In this case, any statements or conduct the individual Defendants made or performed on behalf of Geomet to purchasers or potential purchasers that arose out of the sale or lease of Geomet's products or services are subject to the commercial-speech exemption.

---

[3] We do not address whether an entity that supplies a product to another entity to sell is "primarily engaged in the business of selling or leasing goods or services." However, when an entity sells or leases goods or services, and all its revenue comes from those sales or leases, then the entity is "primarily engaged in the business of selling or leasing goods or services."

Defendants also argue the commercial-speech exemption applies only when every alleged communication by a particular defendant arose out of the sale or lease of goods or services. Defendants cite no authority in support of this argument. We see no reason why the commercial-speech exemption should not apply to a defendant's statements to purchasers or potential purchasers that arose out of the sale or lease of goods of services when the defendant is also being sued for statements and conduct that do not qualify for the commercial-speech exemption, such as the defendant's speech to suppliers, haulers, or other third parties.

Plaintiffs alleged that each Defendant violated TUTSA by "us[ing] EMR Holdings and EMR Recycling's trade secrets to make or facilitate sales of goods or services." Plaintiffs' breach-of-fiduciary-duty cause of action alleged that each of the individual Defendants "used intellectual property belonging to [Plaintiffs] for his own benefit and/or the benefit of Geomet." In their response to the motion to dismiss, Plaintiffs' evidence in support of the claim for breach of fiduciary duty involved the same conduct by Defendants as the claim for violation of TUTSA. These claims are legal actions that include Defendants' conduct and statements arising out of the sale or lease of goods or services in which the intended audience of the statement or conduct was an actual or potential buyer or customer. Under section 27.010(b), those statements and conduct were exempt from the TCPA to the extent they were made to an actual or potential buyer or customer. To the extent Defendants' conduct and statements "mak[ing] or facilitat[ing] sales of goods or services" or using Plaintiffs' intellectual property for Defendants' benefit was not made to an actual or potential buyer, the commercial-speech exemption does not apply.

Plaintiffs argue the commercial-speech exemption also applies to the Defendants' communications with suppliers. Andrew Sheppard states in his affidavit that scrap-metal recyclers provide a service by taking scrap metal. The word "customer" generally means "one that purchases a commodity or service." *Customer*, WEBSTER'S THIRD NEW INTERNATIONAL

DICTIONARY OF THE ENGLISH LANGUAGE (1981). We do not interpret the words "buyer" and "customer" to mean that the suppliers who sell scrap metal to Defendants are the Defendants' buyers or customers. The sellers of scrap metal to Geomet are not buyers or purchasers of a commodity or service; they are sellers of a commodity, scrap metal. The fact that the removal of the scrap metal may benefit them apart from the monetary compensation Geomet pays them does not make them buyers or customers. Therefore, the intended audience of Defendants' statements and conduct arising out of Defendants' purchase of scrap metal from the suppliers was not "an actual or potential buyer or customer." We conclude the commercial-speech exemption does not apply to Defendants' communications with the scrap-metal suppliers.

We sustain Defendants' second issue in part and overrule it in part.

## APPLICATION OF THE TCPA

In their first issue, Defendants contend the trial court erred to the extent the court determined Plaintiffs' claims were not based on Defendants' exercise of their right of association or free speech. In their third issue, Defendants contend the trial court erred to the extent the court determined Plaintiffs established a prima facie case for each essential element of their claims.

The trial court's application of the TCPA is a matter of statutory interpretation that we review de novo. *Youngkin*, 546 S.W.3d at 680. In conducting our analysis, "we ascertain and give effect to the Legislature's intent as expressed in the language of the statute." *State ex rel. Best v. Harper*, 562 S.W.3d 1, 11 (Tex. 2018) (quoting *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008)); *see also Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54, 58 (Tex. 2011) ("Legislative intent . . . remains the polestar of statutory construction." (internal citations omitted)). We construe the statute's words according to their plain and common meaning, "unless a contrary intention is apparent from the context, or unless such a construction leads to

absurd results." *Youngkin*, 546 S.W.3d at 680; *see also Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011) ("The plain meaning of the text is the best expression of legislative intent unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results.").

We consider both the specific statutory language at issue and the statute as a whole. *In re Office of Att'y Gen.*, 422 S.W.3d 623, 629 (Tex. 2013) (orig. proceeding); *see also Youngkin*, 546 S.W.3d at 680 ("[L]egislative intent derives from an act as a whole rather than from isolated portions of it."). We endeavor to read the statute contextually, giving effect to every word, clause, and sentence. *In re Office of Att'y Gen.*, 422 S.W.3d at 629; *see also Norman*, 342 S.W.3d at 58 (noting courts should "never" apply requirement that Legislature clearly and unambiguously express its intent to waive immunity "mechanically to defeat the law's purpose or the Legislature's intent"). We adhere to the definitions supplied by the legislature in the TCPA. *Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 894 (Tex. 2018); *Youngkin*, 546 S.W.3d at 680. In applying those definitions, we must construe those individual words and provisions in the context of the statute as a whole. *Youngkin*, 546 S.W.3d at 680–81.

### Step 1: Whether the Claims Were Based on, Related to, or in Response to Defendants' Exercise of Protected Rights

For Defendants to be entitled to dismissal under the TCPA, they had to prove by a preponderance of the evidence that Plaintiffs' claims were based on, related to, or were in response to Defendants' exercise of the right of association or free speech.[4] Civ. Prac. § 27.005(b). Each Defendant may move for dismissal only to the extent the legal action is based on, related to, or in response to that Defendant's exercise of the protected rights. *See id.* § 27.003(a) ("If a legal action is based on, relates to, or is in response to a party's exercise of the

---

[4] The TCPA also applies to legal actions based on, related to, or in response to a party's exercise of the right to petition, but Defendants do not assert the exercise of the right to petition is an issue in this case.

right of free speech, right to petition, or right of association, *that party* may file a motion to dismiss the legal action." (emphasis added)). A business entity acts only through its agents and is liable for its agents' tortious communications that are referable to the duty the agent owes to the entity and that the agent made in the discharge of that duty. *In re Merrill Lynch Tr. Co. FSB¸* 235 S.W.3d 185, 188 (Tex. 2007) (orig. proceeding); *Richard Rosen, Inc. v. Mendivil*, 225 S.W.3d 181, 195 (Tex. App.—El Paso 2005, pet. denied). A business entity sued for its agents' communications constituting the exercise of protected rights may move for dismissal to the extent the agents made those communications on the entity's behalf and as part of their duty to the entity. *See, e.g.*, *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 354, 362 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (corporation met its step 1 burden, plaintiff did not establish prima facie case, and corporation entitled to dismissal under TCPA); *Wholesale TV & Radio Advertising, LLC v. Better Bus. Bureau of Metro. Dallas, Inc.*, No. 05-11-01337-CV, 2013 WL 3024692, at *3, *5 (Tex. App.—Dallas June 14, 2013, no pet.) (mem. op.) (same).

"'Exercise of the right of association' means a communication between individuals who join together to collectively express, promote, pursue, or defend common interests." CIV. PRAC. § 27.001(2). Exercise of the right of association requires that the "communication between individuals who join together must involve public or citizen's participation." *Dyer v. Medoc Health Servs., LLC*, 573 S.W.3d 418, 426 (Tex. App.—Dallas 2019, pet. denied). "'Exercise of the right of free speech' means a communication made in connection with a matter of public concern." CIV. PRAC. § 27.001(3). A "'[m]atter of public concern' includes an issue related to: (A) health or safety; (B) environmental, economic, or community well-being; . . . or (E) a good, product, or service in the marketplace." *Id.* § 27.001(7).

Central to the definitions of both rights is "a communication," which the TCPA states "includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* § 27.001(1).

Plaintiffs assert that none of their claims are based on Defendants' communications. Plaintiffs argue that the claims are based on Defendants' use of the confidential information to jumpstart their business. We disagree. Part of Plaintiffs' evidence that Defendants violated TUTSA, breached fiduciary duties, breached contracts, and tortiously interfered with contracts was e-mails and other communications Defendants had with purchasers and suppliers. Plaintiffs' alleged damages included lost profits from scrap metal Defendants bought and sold. Those purchases and sales necessarily involved communications with purchasers and suppliers. We will determine whether Defendants' communications constituted the exercise of the right of association or free speech as we analyze each claim.

### Step 2: Clear and Specific Evidence of Prima Facie Case

If Defendants proved by a preponderance of the evidence that the TCPA applies to a claim, then we move to the second step of the TCPA and determine whether Plaintiffs met their burden to establish a prima facie case by clear and specific evidence for each element of their claims. *Id.* § 27.005(c). A prima facie case is the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *In re Lipsky*, 460 S.W.3d at 590. Although pleadings are evidence, Texas's notice pleading rules may require less than "clear and specific evidence" of each essential element of a claim. *Id.* "[A] plaintiff must provide enough detail to show the factual basis for its claim." *Id.* at 591. Circumstantial evidence may be sufficient to meet the required standard. *Id.* But "[b]are, baseless opinions do not create fact questions," and they do not constitute clear and specific evidence establishing a prima facie case. *Id.* at 592. Speculation is not evidence, and it cannot be used to establish causation. *See Van*

*Der Linden v. Khan*, 535 S.W.3d 179, 194 (Tex. App.—Fort Worth 2017 pet. denied). Likewise, conclusory evidence does not satisfy the requirement of clear and specific evidence. *In re Lipsky*, 460 S.W.3d at 592. We examine each of the causes of action that Defendants proved was based on, related to, or in response to their exercise of the right of association or free speech to determine whether Plaintiffs presented a prima facie case of every necessary element by clear and specific evidence.

In determining whether Plaintiffs presented a prima facie case, we consider only the pleadings and evidence in favor of Plaintiffs' case. We do not consider whether Defendants presented evidence rebutting Plaintiffs' case. *Apple Tree Café Touring, Inc. v. Levatino*, No. 05-16-01380-CV, 2017 WL 3304641, at *2 (Tex. App.—Dallas Aug. 3, 2017, pet. denied) (mem. op.); *Moldovan v. Polito*, No. 05-15-01052-CV, 2016 WL 4131890, at *5 (Tex. App.—Dallas Aug. 2, 2016, no pet.) (mem. op.); *D Magazine Partners, L.P. v. Rosenthal*, 475 S.W.3d 470, 480–81 (Tex. App.—Dallas 2015), *rev'd in part on other grounds*, 529 S.W.3d 429 (Tex. 2017); *see also* CIV. PRAC. § 27.005(c) (issue is whether claimant established prima facie case for each essential element).

### Elements of Plaintiffs' Causes of Action

The elements of a claim for violation of TUTSA are (1) ownership of a trade secret; (2) misappropriation of the trade secret; and (3) an injury to the plaintiff or unjust enrichment to the defendant. *See* CIV. PRAC. §§ 134A.002–.004; *see also Morgan v. Clements Fluids S. Tex., Ltd.*, No. 12-18-00055-CV, 2018 WL 5796994, at *4 (Tex. App.—Tyler Nov. 5, 2018, no pet.) ("The elements of misappropriation of trade secrets are (1) ownership of a trade secret; (2) misappropriation of the trade secret; and (3) an injury, if the plaintiff is seeking damages."); *Universal Plant Servs., Inc. v. Dresser-Rand Grp., Inc.*, 571 S.W.3d 346, 360 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("To establish misappropriation of trade secrets under Texas

law, a plaintiff must show the existence of a trade secret that the defendant acquired through a breach of a confidential relationship or through other improper means and that the secret was used without authorization, resulting in damages to the plaintiff."). A trade secret is information that the owner has taken reasonable measures to keep secret and that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* § 134A.002(6).

"The elements of a breach-of-fiduciary-duty claim are: (1) a fiduciary relationship existed between the plaintiff and defendant; (2) the defendant breached its fiduciary duty to the plaintiff; and (3) the breach resulted in injury to the plaintiff or benefit to the defendant." *Neese v. Lyon*, 479 S.W.3d 368, 386 (Tex. App.—Dallas 2015, no pet.).

The elements of a claim of tortious interference with an existing contract are: (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 367 (Tex. App.—Dallas 2009, pet. denied). To establish the element of a willful and intentional act of interference, a plaintiff must produce some evidence that the defendant knowingly induced one of the contracting parties to breach its obligations under a contract. *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied); *COC Servs. Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 671 (Tex. App.—Dallas 2004, pet. denied).

Plaintiffs also pleaded that Goldberg breached his employment contract. The elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the

plaintiff resulting from that breach. *Woodhaven Partners, Ltd. v. Shamoun & Norman, L.L.P.*, 422 S.W.3d 821, 837 (Tex. App.—Dallas 2014, no pet.).

### Transfer of Electronic Information

Plaintiffs alleged Myers, Medina, and Shecht e-mailed Plaintiffs' confidential information to themselves. Plaintiffs alleged Applebaum, Medina, Jackson, Shecht, Richard Goldberg, and Wakser connected data-storage devices to Plaintiffs' computers or accessed data-storage websites from those computers. Plaintiffs also alleged Myers took her company-issued phone with her when she left EMR. They alleged, "Mr. Applebaum's cell phone was reset to factory settings, such that the data thereon was destroyed, in violation of the Handbook." Plaintiffs asserted these actions violated TUTSA and constituted breaches of fiduciary duties.

To determine whether Defendants met their burden under step 1, we must determine whether the electronic transfer of information was a "communication." "'Communication' includes the making or submitting of a statement or document in any form or medium, including . . . electronic." CIV. PRAC. § 27.001(1). In these legal actions, Plaintiffs alleged Defendants transferred electronic documents to which Defendants had access on Plaintiffs' computers by e-mailing the documents to themselves or by saving the documents to other drives or data-storage websites. The act of e-mailing a document to oneself or electronically saving a document to a drive or data-storage website without disclosing the document to anyone is not a "communication" as defined by section 27.001(1) because it does not "make" or "submit" the document. *See Lei v. Natural Polymer Int'l Corp.*, No. 05-18-01041-CV, 2019 WL 2559756, at *5 (Tex. App.—Dallas June 21, 2019, no pet. h.) ("the theft and electronic transfer of trade secrets, without more, is not a 'communication' under the TCPA").

Electronically copying an existing document onto another drive, data-storage website, or the e-mailer's other inbox does not "make" a document because the document was already made.

*See Make*, WEBSTER'S ("to cause to exist, occur or appear"; "to cause to be or become"). "Submitting" a document necessarily requires disclosing or making the document available to another person. Webster's defines "submit" as meaning "to send or commit for consideration, study, or decision : REFER" and "to present or make available for use or study : OFFER, SUPPLY." *Submit*, *id.* Webster's online dictionary defines "submit" as meaning "to present or propose to another for review, consideration, or decision *also* : to deliver formally" and "to put forward as an opinion or contention." *Submit*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/submit (last visited August 22, 2019). The act of e-mailing a document to oneself or saving a document onto a separate drive or data-storage website does not "submit" a document.

Because Plaintiffs' allegations that Defendants electronically transferred information were not based on, related to, or in response to a communication by Defendants, Defendants have failed to meet step 1 as to these claims. Therefore, the trial court did not err by denying Defendants' motion to dismiss as to these claims.

Plaintiffs also alleged certain Defendants took a computer, a computer tablet, and cell phones with them when they left Plaintiffs' employment. Defendants' acts of taking the computer, tablet, and cell phones with the information saved on those devices were not communications because these actions did not make or submit a document. Plaintiffs have not alleged, and Defendants have not presented evidence showing, that these claims were based on, related to, or in response to a communication. Defendants have not proven they met step 1 as to these claims. Therefore, the trial court did not err by denying Defendants' motion to dismiss as to these claims.

Plaintiffs' allegation that Applebaum destroyed data on his cell phone does not involve the making or submitting of a document. Therefore, his destruction of data was not a

communication. Defendants did not meet step 1 as to the claims involving these actions, and the trial court did not err by denying Defendants' motion to dismiss as to these claims.

**Communications Between Defendants and the Purchasers and Suppliers**

Plaintiffs alleged Defendants violated TUTSA, breached fiduciary duties, and tortiously interfered with contracts by using Plaintiffs' trade secrets and confidential and proprietary information to contact purchasers and suppliers resulting in Geomet's purchasing scrap metal from the suppliers or selling scrap metal to the purchasers. These contacts with purchasers and suppliers generally involved Defendants' sending e-mails to the purchasers and suppliers offering to buy or sell scrap metal. Other e-mails from Defendants contained information concerning transactions for the purchase or sale of scrap metal. These e-mails were communications because they were made by Defendants and submitted to the purchasers and suppliers. The communications were "made in connection with" "an issue related to . . . a good, product, or service in the marketplace," scrap metal. Therefore, each individual Defendant's communications with the purchasers and suppliers involved a matter of public concern and were exercises of that Defendant's right of free speech, and the individual Defendants met their burden under step 1 as to these claims to the extent they are not exempt from the TCPA under the commercial-speech exemption. All of these communications appear to have been made by the individual Defendants as representatives of Geomet. Therefore, Geomet also met step 1 as to these claims to the extent the claims are not exempt from the TCPA under the commercial-speech exemption.

*Communications with Suppliers*

Plaintiffs alleged Defendants violated TUTSA, breached their fiduciary duties to Plaintiffs, and tortiously interfered with Plaintiffs' contracts, and that Goldberg breached his contract (1) by contacting the same suppliers Plaintiffs used and that were on the lists of

suppliers taken by Myers and Medina and that were listed in Plaintiffs' Trade 2 system and (2) by the individual Defendants' contacting the same suppliers with whom they did business when those Defendants worked for Plaintiffs. These communications consisted of Defendants contacting scrap-metal suppliers and informing them Geomet was in business, sending the suppliers the prices Geomet would pay for scrap metal, and arranging for suppliers to deliver scrap metal to Geomet.

*TUTSA, Breach of Fiduciary Duty, and Breach of Contract*

Plaintiffs had the burden of establishing a prima facie case by clear and specific evidence for each element of their TUTSA, breach-of-fiduciary-duty, and breach-of-contract claims related to each Defendant's communications with Defendants' scrap-metal suppliers. Critical to all three claims is proof that Defendants' contact with the suppliers involved the use of Plaintiffs' trade secrets or proprietary or confidential information.

Defendants contacted some of the same scrap-metal suppliers listed on the information taken by Myers and Medina. When Defendants worked for Plaintiffs, they had access to information in the Trade 2 system about the suppliers. Although Myers and Medina took from Plaintiffs their lists of purchasers and suppliers, Plaintiffs presented no evidence that Myers and Medina showed the lists to anyone or that they used the information themselves. The fact that Defendants had access to the Trade 2 system when they worked for Plaintiffs, without more, is not evidence they used information derived from those sources after they quit working for Plaintiffs and went to work for Defendants. Plaintiffs presented no evidence that Defendants actually used any trade secrets or confidential or proprietary information to contact the suppliers. That the companies with whom Defendants communicated were involved in the scrap-metal industry was not a trade secret or confidential or proprietary information. Many of the companies with whom both Plaintiffs and Defendants did business had names including words

–27–

like "recycle," "salvage," "scrap," or "metal" in their names, or variations or synonyms of those words, which made it generally known that the company was involved in the scrap-metal industry. Information that is generally known or ascertainable through proper means is not a trade secret. CIV. PRAC. § 134A.002(6)(B). Nor is it confidential or proprietary information. Plaintiffs also failed to show that the contact information for each purchaser and supplier Defendants contacted, all of which were businesses, was not public information.

Former employees do not breach fiduciary duties by competing with their former employers and using skills and knowledge they learned during their former employment. *See Wooters v. Unitech Int'l, Inc.*, 513 S.W.3d 754, 763 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). Plaintiffs argue "[t]he record establishes . . . that [Defendants] used specific information taken from [Plaintiffs] rather than their general knowledge." Plaintiffs cite 410 pages in the record in support of this assertion. These materials include the e-mails Myers, Medina, and Shecht sent to themselves as well as part of the affidavit of Joseph Macken, EMR's group chief information officer, describing the access the individual Defendants had to information in Trade 2 when they worked for Plaintiffs. These portions of the record show these Defendants had access to and took information while they worked for Plaintiffs, but nothing in these pages shows Defendants used any of the materials taken from Plaintiffs after they quit their jobs with Plaintiffs. The fact that Defendants contacted the same companies and representatives of those companies is not evidence they used trade secrets or confidential or proprietary information to do so. *See Greenville Automatic Gas Co. v. Automatic Propane Gas & Supply, LLC*, 465 S.W.3d 778, 787–88 (Tex. App.—Dallas 2015, no pet.).

Plaintiffs argue that Applebaum had to have used Trade 2 information because he, in an e-mail to Jurgen Van Gorp of Metallo, "offers the 'usual package of Ebony' indicating that Josh Applebaum is using EMR Holdings' information contained in Trade 2 regarding the consumer's

preferences." Plaintiffs' assertion that Applebaum's knowledge of the "usual package" came from Trade 2 information as opposed to his own knowledge from having worked with Van Gorp and Metallo in the past or from another non-confidential source, such as Van Gorp's telling him the contents of the "usual package," is speculation.

We conclude the trial court erred by denying Defendants' motion to dismiss concerning the claims for violation of TUTSA, breach of fiduciary duty, and breach of contract from Defendants' contacting suppliers.

### Tortious Interference with Contracts other than the Pecan House Incident

Plaintiffs also alleged that Defendants tortiously interfered with contracts by purchasing scrap from the same suppliers who sold scrap metal to Plaintiffs. For tortious interference with a contract to occur, it is not necessary that the alleged tortious conduct result in an actual breach or cessation of the contractual relationship. *AKB Hendrick, LP v. Musgrave Enters., Inc.*, 380 S.W.3d 221, 236 (Tex. App.—Dallas 2012, no pet.). It is sufficient that the tortious conduct made performance more burdensome or difficult. *Id.*

Plaintiffs do not assert that any supplier breached a contract with them. Instead, they argue that Geomet's purchases of scrap metal from the suppliers Plaintiffs used made it more difficult or burdensome for Plaintiffs to meet their contractual obligations to sell scrap metal to purchasers. Plaintiffs rely on the affidavit of John Maynard, EMR's "President of Non-Ferrous," to provide evidence that Geomet's purchases from the same suppliers made it more difficult for Plaintiffs to fulfill their contracts.

Maynard stated Plaintiffs had a contract to sell 25.2 million pounds of aluminum during a 12-month term and a contract to sell 200 metric tons of brass "for a term." Plaintiffs had to acquire the aluminum and brass to meet their obligations under these contracts. During the terms of these contracts, a supplier from whom Plaintiffs had purchased scrap metal in the past sold

brass and aluminum to Geomet. Maynard states that if that supplier had sold the brass and aluminum to Plaintiffs instead of to Geomet, Plaintiffs could have used those materials to fulfill their contractual obligations. Maynard states how much profit Plaintiffs would have earned by purchasing the brass and aluminum from the supplier and selling it under the contracts. However, Maynard provided no evidence of how Geomet's purchase of that brass and aluminum made it more difficult or burdensome for Plaintiffs to meet their contractual obligations. He did not testify that Plaintiffs could not meet their obligations under their contracts, nor did he testify that Plaintiffs had to pay more for the brass and aluminum to meet their obligations than they would have paid to the supplier who sold to Geomet. We conclude Plaintiffs did not present any evidence that Defendants tortiously interfered with Plaintiffs' contracts with their suppliers.

Plaintiffs also alleged Defendants tortiously interfered with Plaintiffs' contracts with haulers and other third parties. Defendants cite Goldberg's affidavit as evidence that Defendants met their burden under step 1 as to this claim. Goldberg stated,

> Defendants . . . have communicated and continue to communicate with other Defendants, other Geomet employees, or with third parties, including by phone, email, text, and in person communications, about the start-up or operations of Geomet, and about our common interest in those subjects, each according to our day-to-day activities or areas of responsibility for the Geomet business.

Even if this evidence showed Plaintiffs' claim for Defendants' tortiously interfering with Plaintiffs' contracts with haulers and other third parties was based on, related to, or in response to these communications, the evidence does not show what Defendants' communications with haulers and other third parties actually were. Without evidence of the content of the communications, evidence does not show that Defendants' communications with haulers and other third parties were connected with a matter of public concern, which is necessary for the communications to be the exercise of the right of free speech, or that the communications "involve public or citizen's participation," which is necessary for the communications to

constitute the exercise of the right of association. *See* Civ. Prac. § 27.001(3); *Dyer*, 573 S.W.3d at 426. We conclude Defendants have not shown they met their burden under step 1 as to Plaintiffs' claim that Defendants tortiously interfered with Plaintiffs' contracts with haulers and other third parties.

We conclude the trial court erred by denying Defendants' motion to dismiss Plaintiffs' claims for damages from Defendants' purchases from scrap-metal suppliers other than the Pecan House incident (discussed below). Each Defendant is entitled to dismissal of these claims to the extent the claims concern that Defendant's communications. The trial court did not err by denying the motion to dismiss as to Plaintiffs' claims for damages concerning haulers and other third parties.

*Pecan House Incident*

Plaintiffs alleged Defendants violated TUTSA, breached their fiduciary duties, and tortiously interfered with a contract in the Pecan House incident. In this claim, one of the Plaintiffs, Gold Metal Recyclers, had a contract with Pecan House Recyclers. Plaintiffs alleged Shecht told Pecan House that Gold Metal Recyclers had shut down and moved its operations to Geomet. Although Gold Metal Recyclers had already paid Pecan House an advance of eighty percent of the purchase price, Pecan House delivered the load to Geomet instead of Gold Metal Recyclers. According to the affidavit of Andrew Sheppard, the chief operating officer of Southern Recycling and EMR's custodian of records, Jackson "signed for it." Shecht's and Jackson's communications were related to a good, product, or service in the marketplace, namely, Pecan House's load of scrap metal. Therefore, Defendants Shecht and Jackson met their burden under step 1 as to this claim. *See* Civ. Prac. § 27.003(a). Shecht and Jackson made their communications on Geomet's behalf as part of their duty to Geomet. Therefore, Geomet also met its burden under step 1.

To meet their burden of presenting a prima facie case of every element of the claim with clear and specific evidence, Plaintiffs relied on the declarations in lieu of affidavit of Juan Rodriguez and Roberto Flores and the affidavit of Andrew Sheppard. Defendants objected to the declarations because they did not comply with section 132.001 of the Civil Practice and Remedies Code. Defendants objected to a sentence in Sheppard's affidavit about the incident because the statement was hearsay and was an unsubstantiated conclusion unsupported by personal knowledge. The trial court overruled the objections. The objections are preserved for appellate review. *See* TEX. R. APP. P. 33.1.

Section 132.001 of the Civil Practice and Remedies Code provides that an unsworn declaration may be used in lieu of an affidavit in most situations. CIV. PRAC. § 132.001(a), (b). The declaration "must be: (1) in writing; and (2) subscribed by the person making the declaration as true under penalty of perjury." *Id.* § 132.001(c). Section 132.001 also states,

> An unsworn declaration made under this section must include a jurat in substantially the following form:
>
> "My name is _____ _____ _____,
>                    (First)   (Middle)   (Last)
>
> my date of birth is _____, and my address is
>
> _____ _____ _____ _____
>     (Street)    (City)    (State)    (Zip Code)
>
> and _____.
>     (Country)
>
> I declare under penalty of perjury that the foregoing is true and correct.
>
> Executed in _____ County, State of _____, on
>
> the ___day of_____, _____.
>           (Month)     (Year)
>
> _____
>           Declarant"

*Id.* § 132.001(d). The jurats on Rodriguez's and Flores's declarations omitted their middle names, addresses, birth dates, and the day in December 2017 they signed the declarations. In *Bonney v. U.S. Bank Ass'n*, No. 05-15-01057-CV, 2016 WL 3902607, at *3 (Tex. App.—Dallas July 14, 2016, no pet.) (mem. op.), we stated that a declaration with a jurat that omitted the declarant's birth date and address substantially complied with the statute. However, in *Hays Street Bridge Restoration Group v. City of San Antonio*, 570 S.W.3d 697 (Tex. 2019), the supreme court concluded that a declaration in lieu of affidavit that omitted the declarant's birth date "provides no support for the motion." *Id.* at 702 & n.15. *Hays Street Bridge* tacitly overrules this Court's contrary holding in *Bonney*. Following *Hays Street Bridge*, we conclude the trial court erred by overruling Defendants' objections to Rodriguez's and Flores's declarations.

Paragraph 128 of Sheppard's affidavit described the Pecan House incident. Defendants objected to the following sentence in that paragraph: "Mr. Shecht represented to Pecan House Recycling that Gold Metal has shut down and moved its operations to Geomet." Defendants objected to the statement as being an unsubstantiated conclusion not supported by personal knowledge. We agree. Sheppard stated in his affidavit that he was the custodian of records for EMR and "the Chief Operating Officer of Southern Recycling, LLC . . . [with] responsibilities for the region of the country that includes Gold Metal Recyclers, Ltd.'s business, including the geographic area between Florida and Texas." In an answer to an interrogatory, Plaintiffs stated that Sheppard "has personal knowledge of the operations of Gold Metal Recyclers' facilities, including its personnel, its customers, and its suppliers." Neither his positions nor his areas of personal knowledge would give him personal knowledge of a statement made by Shecht to Pecan

–33–

House.  The trial court erred by overruling Defendants' objection to the sentence.[5]  Without the sentence, this paragraph of Sheppard's affidavit shows only that Pecan House sent a load of scrap metal to Geomet because Pecan House thought Geomet and Gold Metal were the same entity.  The paragraph also states Jackson signed for the load when it arrived at Geomet, that Shecht had access to Pecan House's information when he worked for Plaintiffs, and that Pecan House was on the list of suppliers Myers e-mailed to herself.  However, without the first sentence of the paragraph, none of this evidence shows that Shecht and Jackson violated TUTSA, breached a fiduciary duty, or tortiously interfered with a contract.

Because the parties' pleadings are evidence, we also consider Plaintiffs' petition regarding the incident:

> In addition, based on available information, Mr. Shecht represented to an additional Gold Metal customer that Gold Metal has shut down and moved its operations to Geomet.  After that representation was made, the customer sent a load of scrap materials (for which Gold Metal had already paid an 80% advance) to Geomet instead of Gold Metal . . . .  When the scrap materials load arrived at Geomet, Henry Jackson signed for it.

These allegations do not provide clear and specific evidence of a prima facie case.  The allegation does not identify the customer, allege any use of proprietary information, allege that Shecht or Jackson had any knowledge of a contract between Gold Metal and Pecan House, or allege that Shecht or Jackson was aware that Gold Metal had made an advance payment for the load.  *See Dickens v. Jason C. Webster, P.C.*, No. 05-17-00423-CV, 2018 WL 6839568, at *7 (Tex. App.—Dallas Dec. 31, 2018, no pet.) (mem. op.) ("The interfering party must know of the existence of a contract between the plaintiff and a third party or have knowledge of facts that would lead a reasonable person to conclude that a contract existed.").  The petition does not provide sufficient facts to show Plaintiffs established a prima facie case regarding the Pecan

---

[5] Defendants' fourth issue on appeal contends the trial court abused its discretion by "failing to exclude certain proof the plaintiffs offered, and to which the defendants objected."  We sustain Defendants' fourth issue as to the trial court overruling Defendants' objections to the declarations and to paragraph 128 of Sheppard's affidavit.

House incident. We conclude the trial court erred by denying the motion to dismiss Plaintiffs' claims concerning the incident as to Shecht, Jackson, and Geomet.

### *Communications with Purchasers*

Plaintiffs assert Defendants violated TUTSA, breached fiduciary duties, and tortiously interfered with contracts by contacting purchasers using the information taken from Plaintiffs by Myers, Medina, and Shecht, by contacting purchasers who also purchased from Plaintiffs, and by contacting purchasers they worked with while employed by Plaintiffs. Plaintiffs sued all Defendants for each other's speech.

We have already determined Plaintiffs' claims based on each Defendant's communications with actual or potential purchasers were exempt from the TCPA under section 27.010(b), the commercial-speech exemption. To the extent Plaintiffs' claims are against each Defendant for the other Defendants' speech, Defendants may not assert the TCPA as to those allegations because a party may move for dismissal only when a claim is based on, relates to, or is in response to that party's exercise of the protected right. CIV. PRAC. § 27.003(a). A party may not seek dismissal under the TCPA for a claim based on the communications of another party. *See Encore Enters., Inc. v. Shetty*, No. 05-18-00511-CV, 2019 WL 1894316, at \*3 (Tex. App.—Dallas Apr. 29, 2019, pet. denied) (mem. op.) (Encore could not move for TCPA dismissal of Shetty's lawsuit on ground that Shetty's communications constituted exercise of right to free speech).

We conclude the trial court did not err by denying Defendants' motion to dismiss these claims.

**Defendants' Hiring Plaintiffs' Employees**

Plaintiffs alleged Defendants violated TUTSA, breached fiduciary duties, and tortiously interfered with contracts by hiring Plaintiffs' employees to work for Geomet. Plaintiffs also alleged Goldberg breached his contract with Plaintiffs by hiring Plaintiffs' employees.

One court has determined that communications between an employer and a potential employee involve the right of association. *See Abatecola v. 2 Savages Concrete Pumping, LLC*, No. 14-17-00678-CV, 2018 WL 3118601, at *7–8 (Tex. App.—Houston [14th Dist.] June 26, 2018, pet. denied) (mem. op.). In *Dyer v. Medoc Health Services, LLC*, this Court determined that the right of association under the TCPA "must involve public or citizen's participation." *Dyer*, 573 S.W.3d at 426 & n.7 (recognizing disagreement with *Abatecola* and other opinions). Generally, private communications between an employer and a potential employee do not involve public or citizen's participation. *See Staff Care, Inc. v. Eskridge Enters., LLC*, No. 05-18-00732-CV, 2019 WL 2121116 at *6 (Tex. App.—Dallas May 15, 2019, no pet.) (mem. op.). Nothing in the record shows Defendants' communications with Plaintiffs' employees to hire them to work at Geomet involved any manner of public or citizen's participation. We conclude Defendants failed to show Plaintiffs' claims concerning Defendants' communications for hiring Plaintiffs' employees were based on, related to, or in response to Defendants' exercise of the right of association.

For Defendants' communications in hiring Plaintiffs' employees to have involved the exercise of the right of free speech, those communications must have been in connection with a matter of public concern. *See* CIV. PRAC. § 27.001(3). The only evidence of the substance of these communications is that Geomet offered seven of Plaintiffs' employees three dollars more per hour than Plaintiffs paid them and that Geomet offered positions to other employees of Plaintiffs. Defendants have not presented evidence that any of their communications in hiring

Plaintiffs' employees were "made in connection with a matter of public concern." Accordingly, we conclude Defendants failed to show Plaintiffs' claims concerning Defendants' communications for hiring Plaintiffs' employees were based on, related to, or in response to Defendants' exercise of the right of free speech.

We conclude the trial court did not err by denying Defendants' motion to dismiss the claims for breach of contract, breach of fiduciary duty, and tortious interference with contract concerning Defendants' communications to hire Plaintiffs' employees to work for Geomet.

### Goldberg's Tortious Interference with Contract

Plaintiffs alleged Goldberg tortiously interfered with Plaintiffs' contracts with the individual Defendants by "misusing [Plaintiffs'] confidential information and inducing such individual Defendants to misuse [Plaintiffs'] confidential information." From the rest of the pleading of this cause of action, it appears Goldberg's alleged misuse of confidential information to tortiously interfere with Plaintiffs' contracts with the individual Defendants concerned his hiring the individual Defendants. As discussed above, Defendants, including Goldberg, failed to prove by a preponderance of the evidence that their communications regarding hiring Plaintiffs' employees involved public or citizen's participation or were in connection with a matter of public concern. Therefore, the communications were not an exercise of the right of association or free speech.

Concerning Plaintiffs' allegation that Goldberg induced the other individual Defendants to misuse Plaintiffs' confidential information, Goldberg has not shown that the allegation was based on any communication by him or how those communications were based on, related to, or in response to his exercise of the right of association or free speech.

Goldberg failed to show by a preponderance of the evidence that he met his burden under step 1 as to Plaintiffs' claim that he tortiously interfered with Plaintiffs' contracts with the other

individual Defendants. The trial court did not err by denying the motion to dismiss as to this claim.

## Conspiracy

Plaintiffs alleged Defendants engaged in a conspiracy with the unlawful purpose of: "diverting business opportunities from the Plaintiffs to the Defendants by misappropriation of the Plaintiffs' trade secrets, misuse of the Plaintiffs' confidential and proprietary information, and interfering with the contracts with employees of EMR Holdings and Gold Metal." For Defendants' communications to constitute the exercise of the right of association, they must have involved public or citizen's participation. Defendants' communications in this case did not involve any matters of public or citizen's participation. Therefore, their communications were not the exercise of right of association. *See Dyer*, 573 S.W.3d at 426.

The factual bases for Plaintiffs' conspiracy claims are the same as for their tort and breach-of-contract claims, discussed above. Defendants argue they met step 1 as to the conspiracy claims for the same reasons as they did for the underlying causes of action. Plaintiffs argue they presented a prima facie case by clear and convincing evidence for the same reasons as each of the underlying causes of action.

We conclude the conspiracy allegations stand or fall for the same reasons as each of the underlying causes of action.

## Injunctive Relief

Plaintiffs also sought injunctive relief against Defendants. The trial court entered a temporary restraining order prohibiting Goldberg, Applebaum, Myers, "and all entities or individuals acting with them or at their direction . . . from directly or indirectly using, disclosing, replicating, or otherwise misappropriating for their own individual or collective use or benefit . . . any of Plaintiffs' Trade Secrets or Confidential Information." To be entitled to an

injunction, a plaintiff must plead and prove (1) a wrongful act; (2) imminent harm; (3) irreparable injury; and (4) no adequate remedy at law. *Leibovitz v. Sequoia Real Estate Holdings, L.P.*, 465 S.W.3d 331, 350 (Tex. App.—Dallas 2015, no pet.).

To be entitled to reversal on appeal, Defendants had to demonstrate the trial court erred by determining (1) that Plaintiffs' legal action for injunctive relief was not based on, related to, or in response to Defendants' exercise of their right of association or free speech and (2) that Plaintiffs established a prima facie case by clear and specific evidence for each essential element of the claim. *See* CIV. PRAC. § 27.005(b), (c). Even if Defendants demonstrated that the request for injunctive relief was based on, related to, or in response to their exercise of their right of association or free speech, Defendants do not address on appeal whether Plaintiffs failed to meet the burden of establishing a prima facie case for the essential elements of an injunction. Accordingly, Defendants have not shown the trial court erred by denying their motion to dismiss relating to Plaintiffs' request for injunctive relief.

We have concluded the trial court erred by denying Defendants' motion to dismiss relating to certain legal actions. Because Defendants have not shown the trial court erred by denying their motion to dismiss Plaintiffs' request for injunctive relief, we order those legal actions dismissed only to the extent Plaintiffs seek monetary damages.

We sustain Defendants' first and third issues in part and overrule them in part.

**CONCLUSION**

We affirm in part the trial court's order denying the motion to dismiss and reverse in part. The following legal actions are dismissed with prejudice under section 27.005(b) of the Civil Practice and Remedies Code:

> All claims for damages against Mikel Shecht, Henry Jackson, and Geomet concerning Pecan House Recycling's delivering a load of scrap metal to Geomet.

All claims for damages against each individual Defendant for the Defendant's contacting or purchasing from scrap-metal suppliers.

All claims for damages against Geomet for the individual Defendants' contacting or purchasing from scrap-metal suppliers.

In all other respects, the trial court's order denying Defendants' motion to dismiss is affirmed.

We remand the case to the trial court for further proceedings, including considering any request for relief by Defendants pursuant to section 27.009(a) for the dismissed legal actions. *See* CIV. PRAC. § 27.009(a).

/Lana Myers/
LANA MYERS
JUSTICE

180261F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

RICHARD GOLDBERG, KENNETH
GOLDBERG, GEOMET RECYCLING,
LLC, JOSH APPLEBAUM, ALICIA
MCKINNEY, ELOISA MEDINA, LEE
WAKSER, SPENCER LIEMAN, MIKEL
SHECHT, LAURA MYERS, HENRY
JACKSON, AND KELLY COUCH,
Appellants

No. 05-18-00261-CV      V.

EMR (USA HOLDINGS) INC., EMR
GOLD RECYCLING, LLC, GOLD METAL
RECYCLERS MANAGEMENT, LLC,
GOLD METAL RECYCLERS, LTD., GMY
ENTERPRISES, LLC, GMY, LTD., GOLD
METAL RECYCLERS—GAINESVILLE,
DLLC, GOLD METAL RECYCLERS—
FORT WORTH, LLC, GOLD METAL
RECYCLERS—OKLAHOMA, LLC, AND
GOLDBERG INDUSTRIES, INC.,
Appellees

On Appeal from the 116th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-17-14064.
Opinion delivered by Justice Myers. Justices
Brown and Whitehill participating.

In accordance with this Court's opinion of this date, the order of the trial court denying appellants' motion to dismiss is **AFFIRMED** in part and **REVERSED** in part. The following legal actions are **DISMISSED WITH PREJUDICE** pursuant to section 27.005(b) of the Texas Civil Practice and Remedies Code:

> All claims for damages against Mikel Shecht, Henry Jackson, and Geomet Recycling, LLC concerning Pecan House Recycling delivering a load of scrap metal to Geomet Recycling, LLC.

> All claims for damages against each individual appellant for that appellant's contacting or purchasing from scrap-metal suppliers.

All claims for damages against Geomet Recycling, LLC for the individual appellants' contacting or purchasing from scrap-metal suppliers.

In all other respects, the trial court's order denying appellants' motion to dismiss is **AFFIRMED**. We **REMAND** the case to the trial court for further proceedings including considering any request for relief by appellants pursuant to section 27.009(a) for the dismissed legal actions. *See* CIV. PRAC. § 27.009(a).

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 22nd day of August, 2019.